Thank you, Your Honor. I appreciate the opportunity to be here. I represent Richard Castle, and this case rises under a motion to dismiss. I was almost tempted to change it to a motion for summary judgment based on last argument for Judge King, but in any event, the facts here are relatively straightforward. The Castle mortgage had a monthly payment of $396.81 per month. The force-placed insurance policy that was obtained by Capital One had a monthly cost of $200, over $200 a month, 50% of the monthly mortgage payment. Castles complained because the insurance policy that was obtained had several features. First, it was backdating the policy. As of April 6th, they said, we're going to issue a policy today on April 6th, let's go back to February 6th. The second issue was, it was overlapping. The overlapping occurred because, while it's true the Castles let their policy expire, they had obtained a new one that became effective on March 30th. Now what, overlapped for eight days? Seven days, yes. Seven days. And you say backdated? Yes, the backdating is... It was backdated to the time that the first, her policy lapsed? Correct, Your Honor. And it's an occurrence policy or a claims-made policy? Well, that's one of the issues we don't know. The only thing that was presented to the court... Well, if it's an occurrence policy, it's got to cover the period. Well, the reason the backdating becomes important is, and what we don't know... It seems like if it's an occurrence policy, they've got to get it to cover the period where the lapse was. Well, not necessarily, Your Honor, because the issue becomes whether... Well, policies like this are occurrence policies. They're not claims-made policies. Well, we never got the policy, Your Honor. The only thing that was ever submitted to the court was a binder that specifically said it was subject to the terms of the policy that was never presented to the court. I mean, ordinarily, if you have a document within your possession and it's not presented as evidence... You have your own... Did you have your client's policy? No, this was a policy issued by Capital One. Yeah, but your client had a policy. Yes. And it was an occurrence policy, right? Yes. Alright, then February 6th, there was no more insurance. Yes. They had a right to buy insurance to cover the lapse. And they covered 50-some days, 52 days of the lapse, whatever it was. You say they backdated, but that's misleading because they had to cover... They had to get an occurrence policy, which means if there was a fire on February the 7th, there'd be no coverage to protect anybody. Well, Your Honor, but the issue is that they bought, as far as we know... Protecting your client and themselves. As far as we know, Your Honor, when they issued the policy on April 6th, we know as a factual matter that there were no fires. There was nothing... Well, there was a fire, but you could have a claim come up later. I mean, somebody may have fallen through the floor or something and filed a suit a year later. Well, Your Honor, actually, according to their binder, and again, we don't have the full policy... It's an occurrence policy. It's a matter of... When was the occurrence? Well, if it's on February the 10th, even if the suit's brought a couple years later, you need to have insurance in effect at that time. Your Honor, two things. One is, actually, the policy, according to the binder, did not cover personal injury. So in your example, this policy would not cover it. The second issue is whether or not... But they need to cover the lapse, period. Well, the... Here, since we knew the facts that there were no calamities, unless there was an unknown calamity that occurred, and then that would lead to the issue as to whether or not the policy would cover something that was unknown at the time it was issued. There's Maryland case law to the effect that, you know, there's a case where the person went in and bought a nationwide policy the day after a car accident. The Maryland court said that they would enforce it because the facts relating to the accident that occurred the day before were known to the insurance company. So if their basis for covering back things is to cover things that may be unknown, that was the argument that they made, there would be no notice to the insurance company, so we'd have an entire fight over whether the policy would even cover it. But there is also the overlapping. And I apologize if by saying backdate it meant... I wasn't saying that they created, I'm just saying it went back to a period of time prior to its issuance. Okay? So on April 6, they created a policy at that time. There was no damage to the property, there's been no claims made on that policy, and it did overlap. And the other issue that was involved was whether or not the amount of coverage that was obtained was appropriate. The amount of coverage that they obtained was... The original loan amount was $75,000, it was taken out in 2009. At that point in time, it would be no greater than $75,000. There would be some principal reductions over the three years of payments. Where is all this going? You've got a complaint which, it seems to me, have a number of fraud-based counts, and the district court is saying, no, I don't see any affirmative representations, and what the insurance company did here was consistent with what the representations were made, with the representations that were made in the deed of trust. And then, of course, there are the questions about reliance, but it's a fraud-based complaint, and when you read through the complaint, you see these counts are basically fraud-based, and you point out that this is here on a motion to dismiss, which is true enough, but there's also a heightened pleading standard that you have to deal with on the elements of fraud, both with respect to the affirmative misstatement, misleading misstatements, and also with respect to reliance. I think that's at least a part of what you've got to overcome. And you've got to overcome it specifically, because one of the points the district court makes in his opinion is that the complaint was drafted at a pretty general level about the evils of forced-placed insurance, and that may be true, but how do these people engage in fraud? I guess at its simplest level, that's what I'm kind of interested in hearing from you. All right. Your Honor, as a preliminary, it was not a fraud complaint. It was a complaint under two Maryland statutory acts, the Maryland Consumer Protection Act and the Maryland Mortgage Fraud Prevention Act. They were not just simply codifications of a fraud claim. They specifically, and the reason I point that out is because the judge analyzed it strictly as a fraud claim and applied the elements of a common law fraud. And we did supplement the brief with a recent Supreme Court opinion that came out on the 13th. In that particular case, Janowski v. Countrywide... That case dealt with rescission. It was a question of remedies under federal statute. It was a question of remedies, but the reason we cited it, Your Honor, was for the reason that in that decision, they argued that they had a common law analog to the rescission under the Statutory Truth in Lending Act. And the Supreme Court said that there was no tool of statutory construction that requires you to find an analog to common law when interpreting statutes. And in these particular cases, Your Honor, the Maryland Consumer Protection Act does not have a reliance element built in. What it does have is an injury in fact. You say this is not a fraud-based complaint, but the statute is called a Fraud Protection Act? Well, I was discussing the Consumer Protection Act first, but the Maryland Mortgage Fraud Prevention Act, yes, it does talk about fraud. And both of these statutes create an affirmative duty to disclose information that might be important. And the information that we think was important here that wasn't disclosed and which, by the way, the district court found there was a genuine material issue as to fact as to whether or not the failure to disclose the back arrangement between Capital One and these insurance companies was something that a consumer would want to know or a mortgage holder would want to know. So there was a genuine issue. But the Consumer Protection Act still has as an element, you have to... you have to allege a misrepresentation. Well, you can either misrepresentation or omission. False or misleading oral or written statement or failure to state a material fact if the failure deceives or intends to deceive. Now, that would seem to convey a view of reliance. And when you look at the deed of trust, I mean, I don't... Force-placed insurance, I don't have any brief for that. But when you look at the deed of trust, and the deed of trust says, if you let your policy lapse, you had a hazard policy and it lapse, we're going to get... we're going to have... we're going to purchase insurance at our own expense and you're going to be on the hook. And then they go... it says, borrow acknowledges that the cost of insurance coverage so obtained might significantly exceed the cost of insurance that borrower could have obtained. Now, if they're going about this business in a misleading way, why would they put you on notice that if you let your policy lapse, you're going to be on the hook for a policy which may have a good bit higher premium? Right. Is that... In this case, it was six times higher and we're not disputing that... So that's a true representation. I mean, that's absolutely true right there. That is true, Your Honor. But if I'm buying... if someone's saying they're buying insurance, I don't think it's unreasonable to assume that they're buying it at market rate as opposed to have a pre-set arrangement to buy insurance that's going to have attributes that other insurance wouldn't have, where the company has created a profit center. You know, in a car dealer situation, you know, the standard disclosure now is where they tell the person that, you know, the interest rate that you're paying may... we may recover part of that, us, the dealer. There's nothing here that tells someone that, look, we've created a profit center here. That says that we're going to buy insurance, which leads someone reasonably to believe that it's going to be a fair... a fair and reasonable approach to buying that insurance, not that we're going to buy insurance from captive companies because we get money back from there. Is that fair? If the answer is that you all think that would be fair... I mean, there's no reason that this is a profit center. Would you alter your behavior based on... on any of this? The altered behavior, and going back to your reliance, I think the issue of reliance here is where you're paying for something that you consider to be excessive because of deals that you don't know about, that if you paid... I'm sorry, Your Honor. No, I was just going to reiterate Judge Wilkinson's question, which I thought... which I took to be, did you alter your behavior because presumably, or I don't know if this is where it was going, but presumably if you let the occurrence policy lapse because of inability to pay, it's difficult to imagine that you would have been able to afford a different occurrence policy regardless of the amount of premium. May I answer? I'm sorry. It's the same question. The issue here is, Your Honor, okay, so I didn't cover myself with insurance. Does that give them the right to create a profit center where, in essence, I'm paying for something that's unnecessary? Your question went to reliance. Right. The reliance is I paid, and that's what the facts were here. I paid on this expensive policy that I shouldn't have had to pay on. And if I had... the judge dismissed it saying, well, it doesn't say that you would have let it lapse. Those were his... or that you wouldn't have entered into the agreement. But I think one of the reliance here, and it goes to injury in fact under the Consumer Protection Act, is were you hurt by it? Would the premium be substantially higher because it was forced-placed insurance and because the insured had let the policy lapse? Would an insurer, a forced-placed insurer, regard that as a higher risk than somebody who was paying their own way with insurance? Yes, Your Honor, but in this particular case, what we alleged was, in addition to just a general increase in the amount, that what was happening here was how this system was set up was they were going ahead and hiring this outside insurance company, and the overhead expense for that outside insurance company was being bundled into the premiums. So we were in essence paying for the insurance company to do this surge. Now you're not... are you alleging you're not alleging any kickback to Capital One from National Assurance, are you? We are. We did. We alleged that there's a kickback procedure because they're being paid for something when they don't do any work for it. No, no, no, but did Capital One in selecting National Assurance as the forced-placed insurer receive any kind of kickback from National Assurance? We allege that that's exactly what happened, that they're getting payments on this insurance that they're selling to the homeowner at the homeowner's expense, and that is result as part... What did Capital One... did Capital One you're saying Capital One received a kickback? Capital One received a kickback in two ways. We don't know all the details of exactly except one way we can tell is one of the servicer's obligations under the mortgage, under their servicing obligations, was to retain or review these files to see if there was insurance in place. By entering into this agreement with Assurant Assurant took over that obligation. Assurant was doing their work for them. To review the files? Right. To determine whether insurance... Assurance takes over that obligation and because Assurant is taking over that obligation, they're turning around and increasing the premium to cover their costs. So Capital One is being paid... Why is that a kickback? Because they're getting... You mean because Capital One doesn't have to take over the policy? They're not having to provide services that they're obligated to pay. In our complaint for instance one of Fannie Mae's problems with this whole situation is that they're being double billed. That they're paying Capital One to be... You mean Capital One receives a kickback in the sense that they don't have to incur service costs? They don't have to provide that service that they're obligated to provide. That's not any kind of classic kickback. That's a situation of where the insurer simply charges a higher premium in part to undertake those service costs on its own. Your Honor, if you hire me to go deliver a package for $15 and I get someone to come in and do it for me, I don't have to do that work. I've benefited from that. It's not a cash payment kickback. But it's definitely a benefit to me as a result of giving that other person to work. But businesses negotiate for benefits all the time. That's true, Your Honor. But the issue here is... That's what being in business is about. I'm not disagreeing. My point here, Your Honor, is that you have Capital One creating a profit center out of providing insurance. And if I breach a contract with you, are you allowed to charge me a penalty for the breach, or are you only entitled to the benefit of what you bargained for? By allowing them to make this a profit center where I'm paying more for insurance, or even insurance that maybe is unnecessary, they are imposing a penalty on me under this contract. I am paying extra for something over and beyond what I'm obligated to pay under the contract. Which is wrapped into that extra premium, is that what you're saying? Yes, Your Honor. They disclose to you that it's going to cost more. But they don't disclose why. They don't disclose, we have a deal in place where we're going to charge you these extra things. Well, they have to have somebody kind of on call, or at least, so things lapse all the time, they've got to get on the phone and tell somebody we've got to have a lapse policy on that house over in Hagerstown. There's no question. The question is whether, and here's the thing, but that's the point. They had someone set up searching the files. The company is doing the searching here. They're taking over their duties, providing them a service. That way they prevent losses if there's a lapse and there is a fire. They need to keep on top of it. Yes, but they're already being paid to do that by Fannie Mae. It seems to me that you allege a practice that in general terms is open to abuse. The two Maryland statutes that you cite, the Mortgage Fraud Protection Act and the Consumer Protection Act, are written in somewhat general terms. Is this, if the practice has some undesirable aspects to it, I'm wondering if the best way to get at it isn't through a Maryland statute specifically targeted at force-placed insurance and the abuses that can occur in the practice rather than, I know your response will be to, well the legislature's already done that with these two statutes, but they're very general in nature and I'm just, are there bills before the Maryland legislature addressing this topic of force-placed insurance? Because I don't really have a handle on how high the premiums are, how much higher the premiums are, how much is too much, what is the increased risk, and the license strikes me as something that might be the subject of a legislative hearing. There's nothing pending that I know of but I would, as you predicted, I would say the Maryland mortgage fraud was really directed towards mortgage relationships including the servicing. Maryland had the General Consumer Protection Act but they did create the Maryland Mortgage Fraud Prevention Act which addresses servicing issues and we were here on a motion to dismiss and the question is, we never saw the policy so the assumptions as to what type of policy or anything else. You didn't have any discovery at all? We didn't get there but we do have information and we did produce information in the complaint setting forth that there's various studies going on, there's various information that in fact this is the same. You're getting discovery in some other cases around the country though. Well, it's a very hot issue. New York Insurance Commission did some studies. Right, and that's what we alleged and it's the same company and there's public reports from Assurant that talks... Same Assurant or the same forced place insurer? Same forced place insurer involved here. So, I apologize. Thank you, sir. Alright. Mr. Scott, I'd like to hear from you. Thank you, Your Honor. May it please the Court. I'm Robert Scott from Ballard Spa in Baltimore on behalf of the defendant, in this case, Capital One. As Your Honor's correctly pointed out during Mr. Boreson's argument, the plaintiff in this case decided to plead this as a fraud case. It's a claim under the Maryland Mortgage Fraud Protection Act and a claim under the Maryland Consumer Protection Act for deceptive trade practices. Both of those claims require allegations of reliance. I took some action to my detriment based on... And misrepresentation. Of course. Either an affirmative misrepresentation or an omission of some information that you have a duty to disclose. The district court found, I think correctly, that there is no allegation anywhere in the complaint of an affirmative misrepresentation. It's really an omission case. I'm sorry? It's an omission case. Correct. So what we're left with is omission. And you have to allege that there was an omission of information that the defendant had a duty to disclose and that you relied on that omission. In other words, I would have done something differently if they had told me this. If they had told me what their business practices were with respect to how they purchased lender-placed insurance, I would have done something differently. Okay? What? What would you have done differently? There's nothing in the complaint alleging what the plaintiff would have done differently. She doesn't allege she would have got the loan from another lender. She doesn't allege she would not have allowed her insurance policy to lapse. In fact, she admits the reason it lapsed is because she couldn't afford the premium. So that would have happened regardless of what she knew or didn't know about these alleged practices. So she could have amended and fixed this? I'm sorry? She could have amended the complaint and fixed this? She could have either pled a viable cause of action initially, Your Honor, or she could have attempted to amend under rule... She made a motion to amend, didn't she? No, she didn't, Your Honor. In fact, she didn't need to because... I thought at the end of one of the responses she said, if the judge rules against us, we need to amend. She did put that at the end of her response to our motion to dismiss. However, under rule 15, she had the right to amend up to 21 days after we filed our motion to dismiss without leave of court. So she could have amended without leave of court after we moved to dismiss. So she wasn't authorized to amend, you're saying, after that? Well, I'm saying she could have amended, she didn't, and then after the time ran, she never filed a motion to amend. No right to amend? Right. I mean, she had the right to amend, she just didn't do it. Okay. This whole practice of forced place insurance, it does strike me that it's open to abuse and number one, the rate, if counsel's correct, that it's six times higher than her original policy, that's quite a jump up. Number one, your deed of trust said that it may be significantly higher than the insurance the borrower could have taken out on their own, but you do put the word significantly in there, but six times? Did the premium jump six-fold? Three points on that. Number one, if she's alleging that the premium is not authorized by the deed of trust because of the language of the deed of trust, that's a breach of contract action which she hasn't brought. It is six times more though, rather. The premium, she was paying 400 and some and it went to 2400. I believe that's what they allege. Annually. Correct. Those are the facts of the case and you got the coverage for extra period of time, seven days, he says. Did anybody give her money back for those seven days? She alleges that she did not. We dispute that but we're on a motion to dismiss so I'm not going to get into a factual dispute. The other point here is who pays the premium? We hear a lot of talk about these premiums being exorbitant. The servicer pays the premium and then seeks reimbursement from the borrower. These premiums are paid by the lender. It's backed up by the security of the property. Correct. That's true and to the extent there is adequate security there and the lender is able to recover that ultimately, they are entitled to recover it. But in this case, the borrower defaulted and didn't make the payments. That premium was paid by Capital One. It wasn't paid by her. She may have made a few payments after that where she paid some money into escrow towards it. What increased risk justifies a six times increase in the premium? That's really pretty steep. You're almost guaranteeing a foreclosure in that kind of situation. It's almost like I mean I'm not saying this is true but a bank that wanted to force someone into a foreclosure could have a relationship with one of these forced placed insurers and the premium could simply drive the into foreclosure. Your Honor, I know of no reason why a lender would want to force a performing loan into foreclosure. I mean it's not in the lender's interest to do that. These premiums are set by the insurer and the insurer's explanation and we've put a footnote in our brief about this is that they're underwriting these policies blind. There's no  opportunity to contact me, ask me questions about the house. They have an opportunity to do underwriting. In this situation there is no underwriting. They're putting a policy in many instances after time has already passed they're insuring something some period of time that's already passed and there may be if somebody's not paying their mortgage and they're not paying their insurance there's a higher risk that there's going to be a loss. They're not going to be keeping the property up. They're not going to be putting new batteries in their smoke detector. They're maybe not going to be maintaining their furnace. Those are riskier situations. Yes, absolutely. They say you're also inflating the covering amount. Well, yes. She complains about the coverage amount and she says first of all the Deed of Trust says you can only cover yourself lender. You can't cover me. That's completely wrong. The Deed of Trust authorizes What did you do here? You covered what? The fair market value? We covered. We bought a policy in the amount of her last policy. Right. And I believe you also asked if I remember this correctly for notification if there was some information that would verify that the amount should be different. Right. We sent her a letter with the policy and we told her the amount of coverage. This is that joint appendix 330 330 and 31. We sent her a copy of the binder and we told her the amount of this policy is based on your lapsed policy. If you have information that this coverage is not appropriate please contact us. So you made the covering exactly what she had already had. Correct. What was it 236,000? About, yes. And 75,000 or a little less was your mortgage. Right. And she's named as an If there had been a claim, you would have been entitled to your 75,000 and then she would have gotten hers. Correct. Because she was named as an additional named insurer. You were protecting her to be your Absolutely. She would have been entitled to that to the rest of that insurance. So you don't dispute that your insurable interest is the amount of the debt? Yeah. The maximum amount that we would be able to recover under that policy is the amount of the debt. We don't dispute that. And she would be entitled. So you're protecting her equity? Correct. With the 236? Correct. Yeah. And the deed of trust explicitly says the coverage we buy may or may not protect your equity in the property and your possession. So this isn't, I mean, again, let's go back to this is a fraud case. She's claiming she was defrauded. We told her in the deed of trust that we were going to buy insurance. We told her it was going to be more expensive. We told her it might or might not cover her equity. And that's exactly what we did. And then when we did it, we sent her a letter and said, here's the insurance. Here's how we determined the amount of coverage. Are Maryland statutes fraud based? Yes, they are. Absolutely. Because of their language allege misrepresentation? Well, the Maryland Court of Appeals has made crystal clear, and we've cited the cases on page 21 of our brief, that reliance is required under the Maryland Consumer Protection Act. For a claim under the Maryland CPA, a deceptive trade practices claim, you have to They seem to be claiming now that under the Maryland Mortgage Fraud Protection Act, that's a newer statute, and the Maryland Court of Appeals has not issued any decisions under that. They seem to be arguing, well, under that statute, we really don't have to show reliance because it's a broad remedial statute and the reliance is not an element. Well, number one, there's no case that supports their argument. There is a case which they cite in their brief from the District Court of Excuse me. Reliance is an element of a claim under the Maryland Mortgage Fraud Protection Act. So the courts that have weighed in on that have said it is a required element. And it only makes sense because if you don't have reliance, if somebody makes a misstatement and it's floating out there in the air and you haven't taken any action based on it, it hasn't altered your behavior, you haven't done anything that caused you a detriment, then how do you have a claim? Without reliance, there is no claim because there's no causation, there's no harm. No harm, no foul. Correct. We obviously dispute that there's any omission here or that we have any duty to disclose this or that there's any misrepresentation, but we're on a motion to dismiss. So even assuming that that's true, there's no reliance. I'll also point out that this argument about reliance was not made in the district court. There was no argument made in opposition to our motion to dismiss that they did not need to allege reliance. To the contrary, they argued that they had alleged reliance. And if you look at their opposition to our motion to dismiss, which is in the joint appendix, you will see that that's exactly right, that they do not argue that reliance was not a required element. So this is a new argument being raised for the first time on appeal. We don't think it should be considered. We also think it's wrong. I mean, it's only common sense. At the time that this took place, I believe there were multiple companies being used depending on where the loan was originated. No, they were competitors. I mean, it depended on where the loan came from. Capital One acquired different banks and it would depend on where the mortgage came from and that determined the insurer. The amount of coverage would equal what the elapsed policy had been, like here with the 236? Yeah, there was a policy in place. That was the amount of coverage you'd get? Yes. You go out and get 236 and replace it? You got whatever they had in place at the time that the insurance lapsed. In other words, their last policy. When you monitored all this stuff, did you have a system in place where if you covered too much of a period, like here are the seven days, that somebody gets a credit for that seven days because that's an overcharge, right? Yeah, they get a credit. They are entitled to and they receive a credit for all the period of time that they have their own policy. That would be unearned premium? Correct. So that was a safeguard for that? Yes, absolutely. And I think the correspondence even says if the letter, which is JA 329-331 says if you get your own policy, there's going to be a refund. And she apparently claims now that she didn't get it. But under the procedures, she should be reimbursed for the seven days of coverage we're talking about here. That's what we got specifically in this case. Under the procedures, she would be entitled to that. She claims she didn't get it. And again, that's not fraud. That's a breach of contract. If you're arguing, look, I was entitled to a refund for seven days, that's a breach of contract. Judge Wilkinson and I were exploring how this kind of insurance works and I thought they alleged that you were covering excessive periods and putting too much coverage on. Correct. And definitely then they said you're overcharging because you're getting six times, you got a premium at six times. Do you understand the potential for abuse here? Because when you have a lender dealing with an insurer and you give it, the insurer's business model lies on very high premiums for forced place insurance and in return for the lender selecting a particular forced place insurer, the insurer imposes a prohibitively high premium and kicks back part of it to the lender. You know, I'm not saying that that happened here, but the conditions are not impossible conditions for that kind of arrangement to get started. I don't disagree with that at all, Your Honor. In fact, if you look at their complaint, the first, I don't know, 15 pages talks about conduct of the industry and Assurant and other companies and doesn't talk about Capital One. The fact of the matter is Capital One was not getting kickbacks. That allegation is completely false. We're here on a motion to dismiss. I'm not going to argue about the truth of their allegations, but the bottom line is that it's not true. There may have been other people in the industry, other companies doing that and that's why they have all this information in their complaint about other companies. That's guilt by association. They don't have a good faith basis to allege that we were getting kickbacks because we weren't. Well, I'm glad you didn't comment on the truth of the allegations. The only other point I want to make briefly is about the backdating. They complain about the, and Judge King, I think you had it exactly right, that the lender's obviously entitled to buy a policy that's going to cover a period for when there was no coverage. And in fact, the CFPB, the Consumer Financial Protection Bureau, enacted regulations about force-placed insurance to address some of these complaints about abuses. And they enacted a rule at 12 CFR section 1024.37 E3, which explicitly permits a mortgage servicer to buy insurance for periods of time that have no coverage. So the regulations authorize the backdating. That's your position? Yes. You cover the lapse period. Continuous coverage, I think, is the preferred term. That's what we're doing. We're making sure that there's continuous coverage from the day her insurance lapsed until she had her policy in place. We buy a policy. And his argument is, well, there's no fire. You know there wasn't a fire during that period of time. But there can be all kinds of unknown losses. And it doesn't have to be somebody slipping on the sidewalk, personal injury. You could have water leaking in your house and not notice it. There are all kinds of things that could happen during that period of time. And the lender is entitled to purchase insurance. And courts have recognized that. How is the buyer ever going to meet the stepped up premium when the borrower couldn't even meet the far less premium? Are we in a situation where the borrower is simply relying upon forbearance on the part of the lender? Because you know that if they couldn't meet the much reduced premium, they're not going to be able to reach the larger premium. So we really are in a forbearance situation, aren't we? You have a right to foreclose if the security is not insured. Correct. But if in fact the borrower allows the coverage to lapse because they cannot afford it, who pays for the insurance? The lender pays for the insurance. And then if there's enough security down the road, maybe they can recover that. But in most instances, the lender ends up paying for this, pays the premium, and forecloses and never recovers the amount of the debt, let alone the amount of the insurance. So there's no incentive on part of the lender to pay a higher premium. That's part of the fallacy of this. The lender, in the vast majority of the cases, is the entity that's paying for this. They're the ones that eat this cost. It's very few borrowers who actually end up paying these premiums. Because in most instances, they default on the loan, they don't make the mortgage payment, therefore the escrow doesn't have any money to pay the insurance. Insurance lapses and the lender has to go out, the servicer has to go out and buy insurance. So there isn't any incentive for the insurer to pay a jacked up premium. You get those premiums. If you got a piece of property that may be worth three times what the loan was, that's pretty good. It's pretty unusual too in today's market. This particular case looks pretty good for you. Well, ultimately, if that were to happen, yes, Your Honor. But again, the upfront payment comes from Capital One and there's no incentive for us to want to pay more than we need to for insurance. Thank you, Your Honor. Sir, you have some rebuttal. Please step forward. Part of the problem with the argument you just heard is repeated references, the lender doesn't want to do this. The lender doesn't want to foreclose. Who you were hearing from was not the lender. You're hearing from the servicer. The servicer does not own this loan. They're not out the money. He's right. It is the lender, but they're not the lender. They're the servicer. So all of his arguments, how Fannie Mae. So all of these arguments that somehow we wouldn't do it because it would hurt our investment simply do not apply to them. One of the allegations in the complaint was that Fannie Mae has complained about this because they're paying twice. That if they ultimately end up paying this premium, they paid the servicer a fee and as part of those services, they were supposed to look at the whether the property was insured and instead there's a third party coming in who's charging excessive premiums to cover that cost. So they are not the lender. So all of those arguments, but even if we go beyond that, you know, how are we ever supposed to know? I mean, they tell you all these nice sort of, you know, what I would almost call cliches that of course it's going to cost us more and of course the premium's higher because we don't have the right to inspection. We don't get to underwrite like we normally do. How do we know any of that's correct? Is there really? I mean, we allege in the complaint that some of the people say, well, if there's no underwriting, actually it should reduce the cost. That it would come back down and we can talk about the practices of the mortgage industry and the pluses and minuses of those, but it comes back down to whether there are affirmative misrepresentations on material omissions and whether there was reliance in some way upon those and whether you've adequately fled those under the Rule 9 pleading standards and that was what the district court put its finger on and I think the discussion has been very interesting, but it's at times ranged a little bit far afield. I understand and let me go back to the reliance issue because one of the things he did say is you know, what's it matter to these people? What's the detriment? You know, that's the purpose of these statutes is to prevent detriment. The allegations in the complaint are my client paid these high fees and if it turns out How would they have altered their behavior if you knew what you think they should have been taught? Your Honor, I believe how they would have altered, they would have complained saying you're charging me an amount that does not represent the true cost of insurance, which is what this clause was designed to do. This represents an amount that you've come up with where you've bundled in expenses that you should have. But that just leads to the question if you couldn't pay the premiums that existed then no amount would have been financially within grasp. It might not have been, but Your Honor at the end of the day, if the property sold a foreclosure do they not include that in the amount of the debt? I mean, I'm paying it. I might not pay cash for it but I'm going to end up paying it by the equity in my property. So the idea that this doesn't matter, I mean on a cash flow basis I don't disagree. I'm sorry. It did not matter. I was just asking you to specify what the reliance was on these facts. I got a little excited. It's a troubling, it's a very troubling issue. So you can look at it a cash flow basis and you might be right on a cash flow basis, but if at the end of the day my client ends up from the equity in their house paying this of course we've been damaged by it. How could we not have been damaged? And if the test is, would we have dealt with the person who was going to have these back deals? The answer would be no, but to be honest with you it seems sort of a little crazy to say, okay, to pose that question as if there's any answer other than would you deal with someone who is back dealing on you? Well, the answer is no. And if that's the only issue, if that's the reliance that we needed, we did ask for leave to amend to correct any deficiency that the court saw. Now, that's the sole issue because he found it was material as to whether or not they had these back deals in place. So as to that issue, whether the omission meant something, he found yes. The only reason we're here is on the reliance. And I think we did allege that she paid it, and as a practical matter whether she paid it out of ongoing cash flow or she pays it when the property is sold, that is a detriment. If I'm having to pay something that's inflated unnecessarily for a variety of different reasons that we've talked about, I am being hurt. That is not a fair practice. That is a deceptive practice when they don't tell me that the game is rigged, that I'm not getting a market rate. And when they come here and say, we charge more because of this, those are all nice statements, but aren't we allowed to determine whether any of those statements are in fact true? That's what we're asking for. Thank you.
judges: J. Harvie Wilkinson III, Robert B. King, Allyson K. Duncan